Christina FRANCIS, Appellant,

Patrick Davis, Mandee Pingel and
Davis Pingel & Associates,
Appellants,

v.

Daniel WIELAND, Respondent.

WD 79497 and WD 79962

Missouri Court of Appeals,
Western District.

OPINION FILED: February 28, 2017

Rehearing Denied March 28, 2017

Patrick Davis, Kansas City, MO, Counsel for Appellants; Mandee Pingel, Kansas City, MO, Co-Counsel for Appellants; Alan Mandel and Michael Sudekum, St. Louis, MO, Co-Counsels for Appellants.

Alexandra Hutchings, Liberty, MO, Counsel for Respondent.

Before Division Four: Mark D. Pfeiffer, Chief Judge Presiding, Thomas H. Newton, and Lisa White Hardwick, JJ.

Thomas H. Newton, Judge

Ms. Christina Francis, Mother of the 11–year-old child subject to the motion to modify custody at the core of this dispute, appeals a circuit court judgment granting joint legal and joint physical custody to her and Mr. Daniel Wieland, the child's biological Father, and otherwise establishing a parenting plan and ordering child support, and requiring the parties to pay their own counsel fees. She contends that joint legal custody is not justified in light of the court's finding that the parents' relationship is toxic, the court did not make appropriate findings of fact and failed to find that joint legal custody was in the child's best interests, the guardian ad litem failed to properly discharge her duties and should have been replaced, and the court

improperly failed to recuse itself for bias. We affirm.

Mother's attorneys, Mr. Patrick Michael Davis, Ms. Mandee Rowen Pingel, and Davis and Pingel Associates, appeal an order requiring that they pay $75,000 as a sanction for communicating with Father's expert witnesses and abusing the court with, among other matters, a request for more than 2,000 findings of fact. They argue that the circuit court violated their due process rights, sanctions were not justified in the absence of bad faith, the sanction imposed was punitive, and the circuit court failed to afford them the procedural protections required under Rule 36.01. We reverse and remand for further proceedings.

This case originated in St. Louis County where Mother's husband, Mr. Greg Francis, had filed for divorce in 2009. Father was joined as a third-party respondent because Mother had given birth in 2005 to his child while separated from but still legally married to Mr. Francis. After the St. Louis circuit court issued a paternity and custody judgment as to their child in June 2011 and Father sought to modify custody, the case was transferred to Clay County, where Mother had moved. The St. Louis court had ordered joint physical custody and Mother's sole legal custody, and Father's motion to modify requested sole physical and sole legal custody.

Mother lives with their child in Liberty in a home she shares with Mr. Edgar Bozarth, their son, and a son from the Francis union. Mr. Bozarth is legally separated from his spouse; he and Mother are engaged to be married. Father lives in Bunceton, Missouri, in Cooper County on a 2,000–acre family farm; he was married in 2010 to Ms. Angela Wieland. The child has a half sister who lives with her father, Mr. Francis. The Davis Pingell law firm undertook Mother's representation in August 2014, or about a year after the Clay County court assumed jurisdiction.[1]

Mother filed a counter-motion to modify custody in December 2014, seeking sole physical and sole legal custody. Father's parenting plan, filed in April 2015 before the first hearing, called for joint physical custody and joint legal custody, with the child to reside in his home. Father filed a motion for sanctions the day before trial began, and the circuit court indicated that it would hold a hearing on it, but never did so.[2]

Following months of contentious pre-trial proceedings, generating thousands of pages of filed documents, and five days of trial, the circuit court determined that circumstances had sufficiently changed to warrant altering the original custody order from Mother's sole legal custody to joint legal custody, with the child's residence to remain in Mother's home. The court also determined that the financial circumstances had not changed to an extent that would warrant a departure from the $916 monthly child-support award to Mother in 2011.

The circuit court further issued a sanctions order against Mother's lawyers and firm. The order granted Father's motion for sanctions that was based primarily on contacts by Mother's counsel with Dr. Lori Schwartz, who was Father's expert and

---

1. Additional factual matters as to the child-custody judgment appear in the legal analysis below.

2. In this regard, the court stated,
 I'm a little concerned about the allegations made in the motion for sanctions. . . . So I'm not going to deny it and I'm not going to grant it at this point in time. But at some point in time if somebody wants to bring this up again, we will have a hearing after I receive all of the evidence in this case, and if sanctions need to be imposed, they'll be imposed.

the psychologist who had conducted Mother's independent psychiatric evaluation. One element of that contact was a 44 page letter from Mother's counsel to Dr. Schwartz, suggesting that the expert amend her evaluation due to 125 alleged ambiguities and factual inaccuracies. The court cited Mother's counsel not only for contact with Dr. Schwartz, but also with Dr. Aileen Utley, a psychologist who was another of Father's expert witnesses and had conducted the child's independent psychiatric evaluation, and for additional litigation actions purportedly undertaken in "bad faith," including submitting more than 2,000 recommended findings of fact, a number of which were based on evidence not introduced at trial, and were incomplete sentences, irrelevant, or left blank. Thereafter, Mother filed a motion for mistrial and for the court to set aside its judgment, including a request for an order of recusal and the assignment of a new judge. Mother's counsel filed a motion for reconsideration of the sanctions judgment, including a request that the court disqualify itself for bias.[3] The court denied all post-trial motions during a March 2016 hearing, and Mother and her attorneys and their firm filed these appeals.

## Legal Analysis

### Child–Custody Modification Judgment

■ We sustain the trial court's judgment in a child-custody dispute "if substantial evidence supports the order, if the judgment is not against the weight of the evidence, and if the decision does not erroneously declare or apply the law." *M.L.H. by D.R.H. v. W.H.P.*, 831 S.W.2d 677, 682 (Mo. App. W.D. 1992). "Great deference is bestowed upon the trial judge to determine credibility. Appellate courts view the evidence, and any reasonable inference from the evidence, in the light most favorable to the decree, disregarding all contrary evidence." *Id.*

■ Mother's first point on appeal challenges the circuit court's exercise of discretion in ordering joint legal custody and its application of law in "delegating legal authority to psychologists and doctors." She contends that changed circumstances were not shown since 2011 to indicate that Father was capable of working with mother in making joint decisions and that Missouri law does not allow parental or judicial authority to be delegated to third parties.[4] To support its modification judgment, the circuit court specifically found the following changes in circumstances:

A. The minor child misses a concerning amount of school;

B. The child has been seen by several different counselors for a number of different reasons, has been in and

---

3. Mother's counsel also sought to intervene, but when the circuit court observed that Mother would require new counsel if the motion were sustained, counsel ceased objecting to the court's denial of that motion.

4. Father characterizes this point and Mother's fourth point as multifarious in violation of Rule 84.04 because they challenge more than a single trial-court ruling. As such, he argues that they preserve nothing for our review. *See State v. Garrison*, 276 S.W.3d 372, 378 n.4 (Mo. App. S.D. 2009) (stating, "Generally, multifarious points preserve nothing for appellate review and are ordinarily subject to dismissal"); *see also State v. Leonard*, 490 S.W.3d 730, 736 (Mo. App. W.D. 2016) (quoting *Garrison*). Where an appellant's argument is "readily understandable," however, we may elect "to exercise our discretion to review the merits of the arguments set forth in the point relied on." *State v. Robinson*, 454 S.W.3d 428, 437 n.6 (Mo. App. W.D. 2015). Because Mother fully develops each part of points one and four, we consider all issues raised in her appeal on the merits.

out of mental health facilities and received a number of mental health diagnoses;

C. The relationship between [Mother] and [Father] has deteriorated to its current, toxic state;

D. The minor child is often present for arguments concerning his healthcare and treatment between the parties, which is not in his best interest;

E. At the time of entry of the prior judgment the minor child was 5 years old. As a ten-year-old, he needs more time with [Father] and is better able to travel the distance between the parties' residences and able to spend more consecutive nights away from either parent; ...

According to Mother, the St. Louis court supported its award of sole legal custody to her by finding in 2011 that "the parents did not demonstrate the willingness and ability to share the rights and responsibilities of raising their child." Indeed, the court found that "they disagree as to [the child's] health care; his preschool placement; and the choice of his religious upbringing." The court, however, also found that Mother had been the residential and more active parent in making such decisions, "and Father never objected to any of them." Further, "Mother's decisions during the pendency of this litigation as to the education and mental and physical health care for [the child] have been appropriate."

In contrast, while the Clay County court found that the parties had "demonstrated no ability to communicate on any issues" and that their "animosity ... rises to a level seldom seen, even in this courtroom," it faulted Mother for choosing a therapist for the child with no appointment time available outside of school hours and for continuing the child in weekly therapy despite his obvious progress in dealing with his diagnosed attention deficit hyperactivity disorder and post-traumatic stress syndrome. Father's lack of consent to Mother's decisions is implicit, of course, in his filing of a motion to modify custody. The court also found that even Mother's expert witness Dr. Gerald Gentry, who had conducted an independent psychiatric evaluation of Father, had recommended that Father become more involved in the child's mental-health treatment. The Clay County court further determined that both parents had demonstrated an ability and willingness to perform their functions as mother and father, but were unable "to perform those functions together." The court viewed the parenting plan as obviating the need for the parents to work together.

In that parenting plan, in addition to detailing parenting time and the specific cooperative behavior required on the parents' part at the risk of losing joint custody, the court designated certain professionals and facilities for the child's physical, dental, and mental-health care. All had previously been involved in his care in one respect or another and were conveniently located. The court decided to take a middle ground as to the child's mental-health care, rejecting Mother's position that extensive care was required and Father's position that little or no care was required. Because the child's therapist did not have hours other than during the school day and had been involved in the litigation to an extent the court deemed detrimental to the child, the court ordered the parties to choose a new therapist from the list of those included in the child's insurance plan, and if they were unable to agree, to follow Dr. Utley's recommendation. If a change in psychologist were required and the parents could not reach an agreement, they would be required to "follow" another designated professional's referral.

The judgment further requires deference to the medical professionals treating the child. The court was particularly concerned about evidence showing that the parents had disagreed with each other and with medical professionals in the child's presence, and the parenting plan includes directives requiring them to cease this behavior or lose joint custody.

■ Mother cites case law espousing the principle that joint legal custody cannot be awarded to the parents where there is "no basis for concluding [the parents could] work together in the exercise of 'decision-making rights, responsibilities, and authority.'" *Shockley v. Shockley*, 882 S.W.2d 775, 776 (Mo. App. E.D. 1994) (quoting *Lipe v. Lipe*, 743 S.W.2d 601, 603 (Mo. App. E.D. 1988)). Still, despite ample evidence of "personal acrimony between the parents," if the evidence supports a finding that the "parties were . . . emotionally equipped to cast those feelings aside when making decisions concerning the child's upbringing," joint legal custody may be appropriate. *Shockley*, 882 S.W.2d at 776 (discussing *Luther v. Vogel*, 863 S.W.2d 902, 904 (Mo. App. E.D. 1993)). Here, it was clear that the parents had strong and differing opinions about the child's upbringing and care and had clashed over their differences since the June 2011 judgment. Father, however, had testified that, following the months leading to trial, he now believed that joint legal custody was in the child's best interest and he was willing to work with Mother in making decisions on the child's behalf.[5] In light of his previous concerns over any mental-health care for the child, Father's agreement to cooperate in choosing a new therapist represented a particularly compelling sign that he was emotionally equipped to cast aside his acrimonious feelings, particularly regarding this issue. He also understood that the court proceedings had caused the child anxiety, and, to avoid creating more anxiety, he wanted "to be able to work with [Mother] and try to resolve the issue," resorting to mediation if necessary as his parenting plan proposed. Moreover, the guardian ad litem's parenting plan also called for a joint legal and physical custody award. Most of the decisions about the child's schooling, residence, health care, and other activities have already been made under the parenting plan, and many future decisions will require the input of both parents with restrictions on how they go about it. The court urged the parties "to understand, accept and value the relationship the minor child has with the other parent as being important and vital to the minor child." The court clearly had the child's best interest at the forefront of its consideration, and its judgment, based on evidence that the child was emotionally attached to both parents, will protect that interest. By carefully crafting the parenting plan to remove certain flashpoints from consideration, the court also gave the parents a way to avoid returning to court, a situation that Dr. Utley had found contributed to any lingering anxiety for the child.

5. Note also that Father has not sought to appeal the circuit court's judgment, apparently acquiescing in its decision to place the child for residential purposes with Mother, so that he can continue in his current school system where he is thriving, surrounded by the friends he has made in Liberty rather than in Bunceton. That Father will have equal input into significant decisions affecting the child's life is a change from Mother's sole decision-making authority and will give Father further incentive to cooperate or he will risk losing that role in his son's life. The court evidently recognized that Father's evolving effort to compromise was a positive development and further supports its joint legal custody ruling.

In light of the deference we give to the trial court's evidentiary findings, we cannot conclude that the evidence was insufficient to support its joint legal custody award. *See Aurich v. Aurich*, 110 S.W.3d 907, 911 (Mo. App. W.D. 2003) (stating, "[T]his court gives the trial court 'greater deference in child custody matters than in other matters' "). This judgment also comports with Missouri's stated public policy encouraging "parents to participate in decisions affecting the health, education and welfare of their children." § 452.375.4.[6]

■ Mother urges this Court to find that the circuit court's designation of certain professionals to care for the child and to make recommendations if the parents could not agree on a replacement professional is the equivalent of delegating judicial authority because the plan permits others to resolve parental disputes. She is especially concerned that one of the designated professionals, who is also a designated "referree," was one of Father's expert witnesses.[7] She does not cite any authority relating to medical or mental-health professionals making recommendations as to other professionals or care as a way to mediate parental disputes, relying instead on cases concerning a court's use of professionals to issue visitation and custody directives the parents were required to obey, which is "an impermissible delegation of judicial authority." *See M.F.M. v. J.O.M.*, 889 S.W.2d 944, 956–57 (Mo. App. W.D. 1995) (noting that courts derive their power to determine *custody* by statute and must act in the child's best interest). Here, the guidance and recommendations of the designated professionals concerned mental health or medical treatment and advice and had nothing to do with altering custody arrangements. Any further disagreements or lack of cooperation would have consequences involving judicial intervention to change custody; thus the court did not impermissibly delegate its judicial authority. This point is denied.

■ Mother's second point challenges the circuit court's failure to issue findings of fact and conclusions of law as she claims is required under Rule 88.01 and subsections 6, 9, and 13 of section 452.375. Rule 88.01 pertains to written findings required under certain circumstances when a court determines the amount of child support.[8] Subsection 6 requires written findings when the parties cannot agree on a custodial arrangement or the court rejects a proposed custodial arrangement. § 452.375.6. Subsection 9 requires a specific written parenting plan, and subsection 13 requires written findings of fact if the court determines that domestic violence or abuse has occurred. § 452.375.9 & .13.

Mother's point asserts that Rule 88.01 requires findings of fact and she made properly requested findings of fact and conclusions of law, but she discusses Rules 73.01 and 78.07(c) in arguing the point. Rule 84.04(e) limits argument to those errors included in the points relied on. Be-

---

**6.** Statutory references are to RSMo 2000, as updated by the 2012 Cum. Supp., unless otherwise indicated.

**7.** This witness was Dr. Utley, who had conducted the child's independent psychiatric evaluation. The court was entitled to name a specific counselor as part of the parenting plan. *See e.g., Beshers v. Beshers*, 433 S.W.3d 498, 510 (Mo. App. S.D. 2014) (finding that trial court did not impermissibly delegate authority by requiring Mother and child to begin seeing a designated counselor who could expand the unsupervised visits between the two within sixty days of the first counseling visit but had no authority to otherwise alter the custody arrangement set forth in the parenting plan).

**8.** Rule references are to the Missouri Supreme Court Rules of Civil Procedure (2011), unless otherwise indicated.

cause Mother does not explain how Rule 88.01 required the circuit court to address the more than 2,000 findings of fact she submitted, most of which had nothing to do with child support, we do not consider this aspect of the point further other than to note that the circuit court did make findings to justify rejecting both parties' Form 14 and adopting its own Form 14 to support its child-support order.

As for the custodial award the court made, it set forth the statutory custody factors and analyzed the evidence in light of each factor at some length. § 452.375.2.[9] The court specifically found that (1) the parents' wishes favored neither party; (2) both parents "have the ability and willingness to perform their functions as Mom and Dad," accordingly this factor favored neither party; (3) the child has positive relationships with parents, siblings, and others who may significantly affect his interests including Mother's fiancé, and his half brothers, as well as Father's spouse and extended family, thus this factor favored neither party; (4) the parenting plan itself required and would require frequent, continuing, and meaningful contact with both parents, so this factor favored neither party; (5) the child was well adjusted to and doing well in his home, school, and community, thus favoring Mother, particularly as to schooling; (6) the mental and physical health of all individuals slightly favored the Mother, although the court expressed its concern

that the child's level of counseling was not declining "despite testimony that the child is progressing," and the court rejected the psychiatric evaluations of both Mother and Father, because Mother did not fully cooperate, and it did not find Father's evaluation credible; (7) no evidence indicated that either party intended to relocate, thus favoring neither party; and (8) as it had received no credible evidence as to the child's wishes, this factor favored neither party. Accordingly, the circuit court complied in every respect with section 472.375.6.

Mother's parenting-plan challenge has not been preserved for appeal because she did not challenge the form of the judgment as to the parenting plan, including an alleged failure to make statutorily required findings, in a motion to amend the judgment as required by Rule 78.07(c).[10] Still, under subsection 452.375.9, the circuit court did, in fact, include the statutorily required written parenting plan in its judgment. And under subsection 452.475.13, the court did not find domestic violence or abuse, so no written findings were required as to any alleged abuse.

On balance, the circuit court reviewed the relevant testimony and evidence and made the findings required under the law, thus giving this Court a sufficient basis on which to determine, after reviewing the whole record, that its custody decision was

---

9. Nothing in this statute requires a court deciding a child-custody matter to address, adopt, or reject any of the proposed findings of fact submitted by a party, such as the 2,265 "findings of fact" covering 260 pages in the legal record submitted by Mother.

10. Before the circuit court entered its judgment of modification, Mother did file objections to the form and content of the proposed "parenting judgment" that Father submitted to the circuit court. This was not, however, a

motion to amend the judgment. Mother's motion for mistrial and for the court to reconsider or amend its modification judgment includes a statement that the circuit court was required to issue findings as to why it had rejected both Mother's and Father's parenting plans under section 452.375.6. Subsection 6, however, pertains to the court's rejection of a proposed custodial arrangement and not to the written parenting plan, which is addressed in subsection 9. § 452.375.9.

in the child's best interest. This point is denied.

■ Mother's third point asserts that the circuit court "abused its discretion and erroneously declared and applied the law in failing to hold the guardian ad litem accountable for faithfully discharging her duties." She argues that the guardian ad litem failed to properly represent the child's interests and that this failure is cause for a mistrial and a new hearing.[11] Because Mother neither filed a motion to disqualify the guardian ad litem within the time required by section 452.423.1 (within ten days of appointment), nor raised the issue of the guardian ad litem's discharge of her duties at any time before judgment in the case, it has not been preserved for our review. *Francka v. Francka*, 951 S.W.2d 685, 692 (Mo. App. S.D. 1997) (refusing to consider father's claim that trial court failed to properly monitor the guardian ad litem's performance because father failed to object before or during trial). And, even if we were to find the issue preserved and of merit, the guardian ad litem's disqualification at this late date "does not mean that the work of the guardian prior to disqualification is necessarily wasted." *Harrison v. King*, 7 S.W.3d 558, 563 (Mo. App. E.D. 1999) (finding that the trial court properly considered the guardian ad litem's recommendations before disqualification).[12] Accordingly, starting the litigation over with a new guardian ad litem would not be required. This point is denied.

Mother's fourth and final point claims that the circuit court's alleged bias and actions required either recusal or a hearing before an independent judge to determine if recusal was required. She argues that the circuit court abused its discretion and erroneously declared and applied the law by failing to recuse itself from presiding over the case due to exhibiting bias sufficient to suggest a lack of impartiality and by engaging in ex parte communications. She does not provide this Court with a standard of review, and we could deny it on that basis for failure to comply with Rule 84.04.[13] In the exercise of our discretion, however, we will address it on the merits. Mother first sought the court's dis-

---

11. Mother first raised these issues in her post-trial motion for mistrial and complains that the guardian ad litem had one or more ex parte communications with the circuit court, including sending the court an electronic version of her parenting plan and providing edits to a draft of the court's sanctions judgment. Mother also faults the guardian ad litem for failing to (1) meet with the child after conducting a number of initial interviews, (2) adequately review all the relevant evidence, (3) prevent certain evidence from being introduced or heard at trial, (4) protect the child's privacy by not requesting a closed courtroom or protective order, (5) maintain contact with all relevant caretakers throughout the proceedings to ensure the child's needs were met, (6) explain the court proceedings to the child, and (7) recommend certain of the child's preferences in her proposed parenting plan. Mother also contends that her due process rights were violated because the court refused to allow her to make extensive discov-ery requests of the guardian ad litem. During oral argument, Mother raised alleged post-judgment conduct as further support for this point. We decline the implicit invitation to serve as factfinders and will not consider an unsupported fact raised for the first time at argument. *Knight v. Con–Agra Foods, Inc.*, 476 S.W.3d 355, 359 n.3 (Mo. App. W.D. 2015) (refusing to address issues raised for the first time on appeal).

12. A review of the record shows that the guardian ad litem's involvement in the case was extensive, thorough, and appropriate, and no objections were made at any time during the proceedings when she requested payments for her services.

13. We would also note that Rule 84.04(d)(5) limits the number of case citations for each point to four, a number that Mother consistently exceeds in her briefing.

qualification and recusal as to the modification judgment in a motion for mistrial and to reconsider or amend the judgment after the circuit court entered its written judgment. The circuit court orally ruled on the motion as to judicial bias on the basis of the motion without conducting a hearing. It was apparently of the view that the motion should have been submitted before evidence was presented. It also pointed out that both parties had engaged in ex parte communications with the court.

 The Missouri Supreme Court has considered the standards for recusal and appellate court review as follows:

> Rule 2.211(A) sets the standard for when a judge should recuse in a proceeding [and] provides that "[a] judge shall recuse himself or herself in any proceeding in which the judge's impartiality might reasonably be questioned." This includes situations where "[t]he judge has a personal bias or prejudice concerning a party."
>
> . . .
>
> When the judge appears to be biased by "an extrajudicial source [that] results in an opinion on the merits on some basis other than what the judge has learned from the judge's participation in a case," this Court may require disqualification. When evaluating facts in support of disqualification, this Court considers the entire record. Though generally the trial court's judgment as to recusal is reviewed for an abuse of discretion, in cases in which a trial court may not have considered certain facts relevant to disqualification, an appellate court should determine whether those facts are sufficient to require recusal or, at a minimum, a hearing on the record.

> . . .
>
> It is presumed that a judge acts with honesty and integrity and will not preside over a hearing in which the judge cannot be impartial.
>
> . . .
>
> [The movant's] burden does not require a movant to prove that the . . . court was actually biased or prejudiced but rather that a reasonable person would have factual grounds to find an appearance of impropriety and doubt the impartiality of the court.

*Anderson v. State*, 402 S.W.3d 86, 91–92 & n.1 (Mo. banc 2013) (citations omitted) (observing in a footnote that best practice is for a circuit judge to have another judge preside over any hearing in which a motion for that judge's recusal or disqualification is to be decided).

The bases for Mother's assertion of judicial bias against her are as follows (1) the circuit court expressed its concern from the start of trial over her attorneys' actions on the basis of Father's motion for sanctions that was not filed in compliance with procedural rules or her due process rights, thus making it clear that the court had already made a decision on the motion;[14] (2) the circuit court made comments and used a condescending tone during trial indicating its "blatant distaste for Mother's counsel"; (3) the circuit court appeared to rely on extrajudicial information about the magnitude of counsel's fees in ruling on Father's motion for sanctions; (4) Father's counsel, required by the circuit court to submit proposed judgments of modification and sanctions after the court issued its oral ruling, submitted those judgments by email without copying Mother's counsel,

---

14. Mother claims that the motion for sanctions did not comply with Rule 55.03(d), which involves representations, such as pleadings and other filings, made to the court. Because the motion was based on contacts that Mother's counsel made with one of Father's expert witnesses, this rule does not apply.

although this omission was rectified; (5) the guardian ad litem also submitted certain materials to the circuit court, copied to counsel, by email, while the court refused to accept emailed correspondence or documents from Mother's counsel; (6) despite a lack of case law on the issue, the circuit court based its sanctions ruling on direct, substantive contacts Mother's counsel had with Father's expert witnesses, while not sanctioning Father's counsel for doing the same thing; (7) the circuit court received email communications from Father's counsel and the guardian ad litem in violation of local court rule without placing them in the court file to make them available to Mother's counsel; (8) the circuit court refused to hear evidence about all of the time, effort and attorney fees incurred by Mother and her counsel to prepare to respond to allegations in Father's 2012 motion to modify that were subsequently rendered moot, i.e., abandoned, by Father's proposed custodial arrangement and parenting plan filed on the eve of trial, the court made misstatements about Mother's attorney fee during its oral pronouncement of judgment, and then the court changed the basis for making its sanctions ruling between the time of its oral pronouncement of judgment and its written judgment; (9) the court erroneously stated that a motion to disqualify must be filed before evidence was presented, despite Mother's inability to learn about ex parte communications until after the court's oral pronouncement of judgment; and (10) the circuit court overruled Mother's objections that Father's experts testified "outside the parameters of either, the discovery disclosures or the testimony at the experts' depositions," stating that Mother could put on rebuttal testimony, but then would not allow rebuttal evidence.

We agree with Mother that a motion to disqualify for bias and prejudice is not limited to a pre-trial application, but we do not believe that any of the cited instances of purportedly prejudicial conduct rise to a level requiring recusal. *See In re Marriage of Burroughs*, 691 S.W.2d 470, 473 (Mo. App. E.D. 1985) (stating that a party may assert trial court bias and have that issue considered on appeal whether its motion has been untimely filed before trial or during trial, after the evidence has been completed, or where no request has been made for a change of judge). Further, we will not consider, with respect to Mother's points on appeal pertaining to the modification judgment, any argument going to the propriety or impropriety of the circuit court's actions relating to the sanctions judgment, which solely affects counsel. The sanctions judgment is considered separately below.

■ " '[E]xpressions of impatience, dissatisfaction, annoyance, and even anger, that are within the bounds of what imperfect men and women ... sometimes display [do not create bias]. A judge's ordinary efforts at courtroom administration— even a stern and short-tempered judge's ordinary efforts at courtroom administration—remain immune.' " *McPherson v. U.S. Physicians Mut. Risk Retention Group*, 99 S.W.3d 462, 487 (Mo. App. W.D. 2003). In the criminal context, "[a]lleged animosity toward a criminal defendant's attorney may, but does not necessarily, warrant a judge's disqualification." *State v. White*, 462 S.W.3d 915, 918–19 (Mo. App. W.D. 2015). Reviewing the entire proceeding, we are not convinced that a few isolated instances of impatience or anger show that the circuit court appeared biased against Mother. Nor did counsel preserve for our review any non-verbal indicia of alleged animosity. *Id.* at 920 (observing that such communications "may be difficult to discern from a trial transcript" and that counsel "did not at any time seek to preserve on the record that the judge had

displayed an angry demeanor toward him"). The court expressed the same level of impatience at times with Father's counsel and sustained many objections against her. That the court referred at times to the sanctions motion, which was based on counsel's conduct, does not indicate that it had prejudged the custody issue on the merits due to bias against Mother.

 Ex parte communications in the form of email submissions to the court, while not to be encouraged especially when opposing counsel is not copied, do not evidence bias against the party that does not submit them or is not allowed to submit them. Where the ex parte communication is simply part of the administration of a case, that is, the submission of a proposed judgment or parenting plan, and does not involve extended meetings and conversations about the case merits, such communication would not appear to the reasonable layman to "indicate the hardening of the judicial mind" against a party. *McPherson* 99 S.W.3d at 489. Court rulings about evidentiary issues are fully within judicial discretion, and we do not find that discretion abused or bias indicated where the court seeks to limit testimony to the issues and evidence actually before it and is sufficiently informed at the conclusion of direct evidence i n the case to render its ruling. The legal record comprises nearly 5,000 pages. The case was pending before the Clay County court for less than three years before it was decided, yet the docket sheet consumes 23 pages. The court conducted five days of hearings on the merits. At issue is a motion for modification of custody involving one child. Any efforts the circuit court made to streamline the proceedings are more reflective of common

sense and concern for judicial and client resources than they are of bias.[15] As to whether the court made its custody determination on the basis of anything other than the record, Mother does not indicate in what way the modification judgment reflects a reliance on extrajudicial sources of information about either parent or the child. This point is denied.

Because we find no merit to Mother's challenge to the circuit court's ruling on the motion for modification, we affirm the modification judgment.

### Sanctions Judgment

 Regarding the appeal that Mother's attorneys have filed from the circuit-court's sanctions judgment, we review the imposition of sanctions "for abuse of discretion. 'An abuse of discretion occurs when the court's order is clearly against the logic of the circumstances and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration.'" *A.J.H. ex rel. M.J.H. v. M.A.H.S.*, 364 S.W.3d 680, 681 (Mo. App. E.D. 2012) (quoting *Rea v. Moore*, 74 S.W.3d 795, 799 (Mo. App. S.D. 2002)). We have previously addressed the sources and exercise of a trial court's authority to impose sanctions as follows:

A trial court has the inherent power to enforce compliance with its reasonable orders and may, at its discretion, impose sanctions when they are justified, considering the conduct of the parties and counsel. A court has the inherent power to sanction bad faith conduct, probably by way of awarding attorney's fees, on analogy to the power to award attorney's fees related to prosecuting a contemnor. The imposition of sanctions

---

15. While *Anderson* suggests that best practice would be for the challenged judge not to preside over a disqualification hearing, and we would recommend that courts abide by

that recommendation, we do not believe that the circuit court's failure to do so here constituted error. *Anderson v. State*, 402 S.W.3d 86, 91 n.1 (Mo. banc 2013)

... transcends a court's equitable power concerning relations between the parties and reaches a court's inherent power to police itself, thus serving the dual purpose of vindicating judicial authority without resort to the more drastic sanctions available for contempt of court and making the prevailing party whole for expenses caused by this opponent's obstinacy. A court must, of course, exercise caution in invoking its inherent power, and it must comply with mandates of due process, both in determining that the requisite bad faith exists and in assessing fees.

The existence of sanctioning schemes established by rule or statute does not displace the inherent power of the court to impose sanctions for bad faith conduct. The inherent power of a court can be invoked even if procedural rules exist which sanction the same conduct.

*McLean v. First Horizon Home Loan, Corp.*, 369 S.W.3d 794, 801 (Mo. App. W.D. 2012) (citations omitted).

The court's sanctions judgment is based both on Father's motion for sanctions and its inherent authority to impose sanctions. As to the grounds set forth in the motion, the court cited various direct contacts that Mother's counsel had with Father's expert witness Dr. Schwartz, including the aforementioned 44 page letter [16]; phone calls to Dr. Schwartz requesting that she video record her psychiatric evaluation of their client or allow counsel to attend the evaluation; a misrepresentation to Dr. Schwartz that the court said "it would be a good idea" to record the evaluation; and evidence that counsel had sent Dr. Schwartz a disc containing 1,187 pages of information with the child's medical records, case pleadings, and transcripts from this case and other litigation involving Mother and Father, photographs of the child, and other documentation.

As to those facts that would have been specific to its inherent authority, the court addressed counsel contacts with Father's

---

**16.** Noting the 125 purported inaccuracies and mischaracterizations that counsel brought to Dr. Schwartz's attention so she could amend Mother's psychiatric evaluation report, the court also focuses on references in counsel's letter to other experts, including her colleague Dr. Gerald Gentry, who had, counsel asserted, testing and interview processes unlike those used by Dr. Schwartz. I n the court's view, this was "an apparent attempt to pressure Dr. Schwartz to change her report and, therefore, her testimony."

During oral argument, Mother's counsel referred to *Brown v. Hamid*, 856 S.W.2d 51, 54 (Mo. banc 1993), in which the Missouri Supreme Court held that ex parte contacts between counsel and an opposing expert are not forbidden under the rules "to discuss matters previously disclosed," unless the attorney "emphasizes his or her connections with an expert's colleagues or superiors—especially when unrelated to the case—it may constitute a form of pressure on an expert's decision to testify, and implies the possibility of indirect benefits or punishments from that decision." That case involved a non-treating expert for a

woman claiming medical malpractice and opposing counsel's ex parte contact with the expert expressly intended to dissuade him from testifying. *Id.* at 53. Because no prejudice was shown to the plaintiff, in that the expert was not dissuaded from testifying, our supreme court determined that the trial court did not err in failing to sanction the doctor or his attorney. *Id.* at 55. Its standard of review was an abuse of discretion that could be reversed only upon a showing of prejudice to the complaining party. *Id.* at 54. The situation here involves a non-treating expert who was also named by court order as Mother's independent psychiatric evaluator. Mother's counsel attempted to use the influence of Dr. Gentry—a colleague of Dr. Schwartz—to convince her to change her report and thus change her testimony about Mother. And here, unlike in *Brown*, the circuit court imposed sanctions. We are not persuaded that *Brown* must be read as rendering counsel's conduct permissible. In fact, the court specifically stated that "[i]n some circumstances, such pressure may constitute a violation of an attorney's ethical duties or the criminal law." *Id.*

expert witness Dr. Utley. Of particular concern was a letter from counsel, transmitted to Dr. Utley via email, expressing their belief that an appointment she had scheduled that day to continue her psychiatric evaluation of the child should not proceed because its scheduling had not followed the procedures set forth in the court's order allowing the evaluation. Dr. Utley subsequently cancelled the appointment with the child and Father, concerned that she would be in contempt of court if she proceeded. According to the court, this communication from counsel hindered Dr. Utley's ability to complete her evaluation of the child, and misled her "into believing she could not meet with [Father] and minor child at the scheduled appointment time."

Additional behavior the court cited to warrant sanctions included Mother's 260–page request for written findings of fact and conclusions of law; counsel's assertion during a hearing on expert-witness designations that Dr. Utley had been subject to multiple ethical complaints, when this was not true; the service of 34 pages of interrogatories and a request for production of 74 items on the guardian ad litem, necessitating a motion to quash; counsel's scheduling of a Saturday deposition despite a court directive that such depositions not be scheduled without the agreement of all parties, necessitating a motion to quash; and an unreasonably long deposition of Father, necessitating a motion to terminate.

■ Mother's counsel assert three points relied on in their appeal, raising procedural and factual issues to support their claim that they were unfairly sanc-

tioned. Because the circuit court indicated before trial began that a hearing would be held to consider Father's sanctions motion, but did not conduct that hearing, as a matter of fundamental fairness, we reverse the circuit court's sanctions judgment.[17] On remand, the circuit court is ordered to provide proper notice of a hearing to Ms. Pingell, Mr. Davis, and their law firm on the motion for sanctions and alleged bad-faith conduct and to conduct a limited hearing. Because the motion for reconsideration of the court's oral pronouncement of the sanction judgment specified that counsel were precluded at trial from presenting the testimony of Dr. Gentry relating to their letter to Dr. Schwartz, they may present this witness and testimony to the extent it differs from or adds anything to the Gentry affidavit filed with their motion to intervene. If the parties and circuit court agree that additional witnesses, evidence or argument would clarify the issues, such evidence may be introduced and such argument may be heard. The court may, on remand, consider all of the proceedings to date and the filings, motions, actions by counsel in open court, and evidence adduced in this proceeding to date, and prior proceedings in reaching its decision regarding sanctions.

## Conclusion

Finding no merit to Mother's appeal, we affirm the circuit court's child-custody modification judgment. We find merit to the appeal filed by Mother's counsel, solely as to the lack of a hearing on the sanctions motion. Accordingly, we vacate the sanctions judgment and remand for a hearing

---

17. We express no opinion on the specific legal and factual issues raised in counsel's points. We would note that a sanctions hearing is not required in every case. Here, counsel's conduct was a matter the court could observe throughout the proceedings, and it had the inherent authority to impose sanctions without a hearing on the basis of any bad-faith conduct it observed.

on the sanctions motion and alleged bad-faith conduct.

Mark D. Pfeiffer, C.J., and Lisa White Hardwick, J., concur.

